Meier Steinbrink,
Spec. Ref. This is an application, pursuant to article 78 of the Civil Practice Act, for an order directing respondents to issue to petitioner a permit to install a gas regulator with adequate ventilation in a public street as prescribed by an order of the Public Service Commission of the State of New York.
Originally petitioner’s application for an order, peremptory or alternative, was denied and the petition dismissed at Special Term, Part I (154 N. Y. S. 2d 62). On appeal the Appellate Division by a 3-to-2 vote affirmed (4 A D 2d 677). On further appeal the Court of Appeals by a 4-to-3 vote modified the order and directed the issuance of an alternative order under section 1295 of the Civil Practice Act (4 N Y 2d 727). A trial under this alternative order has been had and the matter is now before me for decision.
By stipulation and consent of the parties, and accompanied by counsel for both sides, I spent an entire day viewing gas installations at Van Wyclc Boulevard and 116th Street in Queens; at Vanderbilt Avenue in Brooklyn; and at Clifton, Richmond, Staten Island.
Petitioner is a gas corporation organized in 1895 under the Transportation Corporations Law. In that year it acquired *127 the property and franchises of seven gas companies including the Brooklyn Gas Light Company created by chapter 204 of the Laws of 1825. The other companies were incorporated at various times after enactment of the general act (L. 1848, ch. 37) authorizing formation of gas light companies. That act is now in the Transportation Corporations Law (art. 2).
It appears that from 1909 to 1955 permits were issued to petitioner and other gas companies by the authorities of the City of New York for opening of streets and the installation of various gas regulators therein. On June 6, 1955 petitioner applied to the city “ for a permit for the installation of a gas safety regulator in a pit with a vent post as prescribed by the Public Service Commission order dated November 7, 1952 in case 15686.” A particular location was designated. On June 7, 1955 respondent’s chief engineer replied, “ * * * We will issue a permit for the installation of a regulator in a pit but we have been requested by the Bureau of Franchises to withhold permits for the installation of vent poles in the sidewalk area until permission for this has been granted by the Board of Estimate through the Bureau of Franchises ”. Thereafter the city took the position and maintains it here that it would neither issue permits for the installation of the vault, the regulators nor the vent poles without the prior consent of its Bureau of Franchises of the Board of Estimate and the payment of compensation for the privilege of doing so. Caught between the necessity of complying with the concededly reasonable order of the Public Service Commission and the refusal of the city to permit the installations except upon its own terms, this proceeding was begun on June 13, 1955. While it refers to one specific location it is stated to be a test case involving 356 locations in New York City for petitioner and other gas companies.
The basic issue is whether, as petitioner contends, its franchise right “to lay conductors for gas in the streets” includes the right to install gas regulators in vaults in the streets, together with suitable vent poles. The city admits, as indeed it is well established, that by statute and original consents petitioner has a perpetual franchise to the use of city streets for “ conductors for gas ” and that if the installations for which permits are here sought are in that category then the refusal to issue the permits is arbitrary and the petition should be granted. It claims, however, that the regulators are not in the category of conductors and that even if they were, then the vault space in the streets into which they are placed and the vent poles required by State authority are not. Respondent contends that, *128 in spite of the fact that it has regularly from 1909 to 1955 raised no objection to these installations and in fact has issued administrative permits therefor, they are not “ conductors for gas ” embraced in the company’s franchise rights and may not be installed or hereafter maintained without a new franchise or consent of the Board of Estimate. Of course, there can be no right acquired by long usage to the use of parts of the streets in the nature of adverse possession but it seems to me that although not binding it is highly significant that the engineers and administrative assistants of the city have for over 45 years interpreted the franchises of the gas companies as including the right to make such installations, a right which they could only have if the installations were part of the conduction system. In fact, it was only when petitioner sought approval for the installation of sidewalk vent poles which are public safety protective instrumentalities in connection with the regulator installations that the controversy arose even though some vent poles had previously been installed (see, e.g., Exhibit 3, permit for such a vent pole issued August 29, 1952). It is true, of course that respondent has since shifted its position.
Respondent urges that the holding by the Court of Appeals in Matter of Brooklyn Edison Co. v. Davidson (269 N. Y. 48) is controlling and decisive of the present application. That was the view of Special Term and of the majority of the Appellate Division and even of the minority of the Court of Appeals but not of the majority of the Court of Appeals who stated, “ We do not regard Matter of Brooklyn Edison Co. v. Davidson * * * as necessarily decisive.” This last expression of the Court of Appeals is, of course, binding upon me. A comparison of the Davidson case with the present case is necessary. That was an application by an electric corporation to compel the administrative authorities of the city to issue a permit for installation in the city streets of electric transformers of 500 k.v.a. capacity and weighing over five tons, in vaults 16 feet long, as being embraced in their franchise to place in the public streets “ suitable wires or other conductors, with the necessary poles, pipes, and fixtures ” for transmitting electricity. It was there held that the transformers were not embraced in such franchise as their function was not to act as a channel for transmission of electricity. Respondent contends that the gas regulators involved here are similar to the electric transformers in the Davidson case. I cannot agree.
An electric transformer such as was involved in the Davidson case is a device to step up or step down voltage in the fixed *129 proportion that the number of windings of the primary coil bears to the number of windings of the secondary coil. It cannot regulate voltage. Alternating electric current entering the transformer on the primary winding creates an alternating magnetic field in the core of the transformer which energizes and activates different md independent electrons in the secondary winding. Thus current which enters the transformer consists of different activated electrons from that which leaves the transformer. The proof before me clearly establishes that an electric transformer interrupts the flow of current in the circuit which then passes from the central or main generator to the primary winding of the transformer and back to the generator. Voltage different from that in the primary is induced in the secondary coil of the transformer and when connected to a circuit produces electric current similar to that produced initially by the action of the large generators at the electric plant. Thus, current is generated in a transformer different from the current which enters the transformer.
The gas regulator on the other hand is essentially a valve installed in the gas main to regulate or control the flow of the gas through the distribution system. It does not interrupt the flow of gas and the gas is not in any way changed, chemically or otherwise, pressure being determined merely by the amount of the gas in a given area. The function of the regulator is to let the identical gas go through but by automatic controls of the openings, the quantity of gas permitted to pass is controlled. Safe operation of gas appliances requires relatively uniform pressure of the gas. Consumer demand varies; when demand increases, pressure begins to fall (because of the smaller volume of gas in the pipe area) and the regulator diaphragm opens to allow more gas to pass into the distribution lines. Conversely when demand decreases pressure begins to rise and the regulator constricts the opening thus allowing less gas to pass through. It is not possible to operate a gas system without regulation of the pressure. The regulators are required as safety measures by order of the Public Service Commission. The Public Service Commission now requires dual regulators to be installed, separated by a distance of at least 50 feet, ‘1 thus minimizing the potential dangers of the failure of one stage of regulator equipment due to fire, explosion or damage of any kind, from adversely affecting the operation of other stages of regulator equipment ’ ’. It also requires double duct ventilation extending above ground in place of the manhole cover ventilation formerly believed adequate, the manhole covers now being made water-tight. These requirements were largely the result of the *130 experience through a most serious explosion at Brighton, N. Y., caused by malfunctioning’ of a pressure regulator.
The fact that these requirements have been made by the Public Service Commission does not give petitioner any additional right to the use of the streets but it is indicative of the necessity for such installations. While respondent has attempted to show that these regulators could be installed on private property, the proof is overwhelming that for all practical purposes these regulators must be installed in the city streets where they have been for many years. In fact, respondent frankly takes the position that upon application therefor and the payment of a fee which it will set, such installations in the city streets will be permitted. Incidentally, the regulator stations on private property visited by me at the urging of respondent are completely different from the regulator stations here involved. There, functions other than regulating of pressure are performed and the regulation is only incidental thereto.
It must be borne in mind that the franchise of petitioner and other gas companies depends upon-rights granted to them by the Legislature. In interpreting the intent of the Legislature it must be presumed that when in 1848 (L. 1848, ch. 37, § 18) it granted to gas corporations the power 11 to lay conductors for conducting gas through the streets” or in 1926 (L. 1926, ch. 762) Transportation Corporations Law (§ 11, subd. 1) “ to lay conductors for gas in the streets,” it intended that such conductors be installed and operated in a safe manner for the public safety and convenience and not in such a manner as might lead to a disaster as occurred in Brighton. It is obvious that the term “ conductors ” includes more than the mere pipes through which the gas flows. Even respondent’s expert agreed that it is essential that the pipes have associated with them certain fixtures and protective devices which he agrees are part of the conductors; that, for example, valves installed along the mains to shut off the flow as a safety measure were part of the conduction system but he maintained that a valve whose principal function was to regulate the flow of gas and thus affect the pressure was not a conductor. I believe the regulators are part of the conductors as protective devices in the conduction system required for safe operation and for public convenience.
It is my conclusion and I find that the gas pressure regulators are conductors and part of the conduction system for gas permitted by petitioner’s franchise to be installed in the city streets.
*131 An additional question arises by reason of the contention of respondent that, even if the regulators themselves be part of the conduction system, the vaults into which they are installed and the vent poles required to be used in connection with such installation are not. I cannot agree. The regulators'; are required to be installed below the surface of the street in a space of such suitable size as to permit at least weekly access thereto and an opportunity to make repairs if necessary. They must be protected against weather, damage and tampering. As previously stated, the installations have been by means of subsurface vaults for many years. These are in the same class as manholes for installations of cut-off valves and for means of access to the mains. They are not independent installations but necessary parts of the regulators, without which the regulators would be useless. The same applies to the vent poles. They are necessary parts of the regulator installations and required by order of the Public Service Commission. The proof further indicates that these vents are now combined in a single concentric pole and that the vault area is smaller than heretofore used. It indicates the desire of petitioner to restrict its use of city streets to the smallest area possible consistent with safety and efficient service to the public.
There is little question of fact involved here, but whatever issues of fact there may be I find in favor of petitioner. I regard the testimony of petitioner’s expert as more reliable than that of respondents’.
Upon all the proof before me, I find that petitioner has sustained the burden of showing its right to the issuance of the permits sought and that the failure of respondents to issue the same was arbitrary and unlawful. Application granted. Settle final order on notice.